UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                    CASE NO. 20-20373
                                       HON. DENISE PAGE HOOD

v.

ARMANI POOLE,

          Defendant.

_____/

## ORDER DENYING MOTION TO SUPPRESS [ECF No. 32]

### I.    Introduction

Defendant Armani Poole is charged with alleged violations of: (1) 18 U.S.C. § 922(g)(1) and (2) – felon in possession of a firearms/ammunition, aiding and abetting; and (2) 18 U.S.C. § 922(d) – unlawful disposition of a firearm to a felon. ECF No. 17.  Defendant was charged following the execution of a search warrant on August 20, 2020. ECF No. 32 at Ex. A.  The search warrant affidavit's primary basis for probable cause stems from information from cooperating defendants, a cooperating witness, personal observations of law enforcement, and information gathered by law enforcement officers during their investigation.

Defendant has filed a Motion to Suppress claiming that the search warrant affidavit is deficient for several reasons: (1) it fails to establish any nexus between Defendant's home and vehicle and any criminal activity; (2) even if there is a

sufficient nexus established, the affidavit relies on stale information; and (3) the affidavit contains critical misstatements regarding Defendant's business and financial information. ECF No. 32, PageID.93, 95.  The Motion to Suppress has been fully briefed, and the Court held a hearing on the Motion to Suppress on December 2, 2021.  For the reasons that follow, Defendant's Motion to Suppress is denied.

## II.    Factual Background

In August of 2020, law enforcement officers intercepted a package containing a large quantity of fentanyl that had been shipped from California to a home in Michigan. The package was addressed to "Brian Thomas" at a home on Sprenger Ave. in Eastpointe, Michigan. Agents replaced the contents of the package, inserted a tracking device, and developed a plan for a controlled delivery of the package to the home on Sprenger for August 10, 2020.

The controlled delivery occurred as planned, though no one named "Brian Thomas" resided at the home on Sprenger. The home was occupied by Chandra Collins (who is Defendant's stepmother) as well as Ms. Collins' three children. Ms. Collins answered the door and accepted the package. A short time later, the tracking device in the package alerted agents that the package had been moved and opened. Agents descended on the home and interviewed the occupants, including Matthew Wayne Jr., the adult son of Ms. Collins. They learned that Ms. Collins had opened the package, after which Wayne panicked and tried to reseal the box, telling his

mother that he was not supposed to open the box. Agents examined Wayne's phone and saw a series of text messages from "Marco" that they believed were related to the package. Ms. Collins identified "Marco" as Demarco Ritter, the boyfriend of her stepdaughter, Armani Poole (Defendant).

Ritter then arrived at the Sprenger address in a vehicle driven by Defendant. Ritter was interviewed by law enforcement officers and admitted that he believed the package contained marijuana, that he was to bring the package to an individual who was going to pay him, and that Ritter intended to pay Wayne $500 for allowing the package to be delivered to his house. Ritter did not indicate that Defendant knew about the package or Ritter's intentions for it.   Defendant was interviewed and denied knowledge of the package. Defendant advised that: (1) she had two handguns in her vehicle (one in her purse and one in the center console); (2) both guns were registered to her; and (3) she had a CPL. DEA Agents confirmed this information and returned the guns to Defendant. Defendant agreed that agents could search her phone, and the search yielded nothing of evidentiary value.

Nine days later, a search warrant application and affidavit to search Defendant's home and vehicle were submitted. ECF No. 32, Ex. A. The search warrant application indicated that agents sought (1) evidence of crime; (2) contraband, fruits of a crime, or other items illegally possessed; and/or (3) property designed for use, intended for use, or used in committing a crime. The application

indicated that the search was "related" to alleged violations of conspiracy to possess with intent to distribute controlled substances and possession of a firearm in furtherance of controlled substance distribution. A warrant was authorized by Magistrate Judge Elizabeth Stafford on August 19, 2020 and executed on August 20, 2020. The search yielded several items, including Defendant's two legally possessed firearms, the same firearms that had been returned to her by a different set of law enforcement agents 10 days earlier.

## III.   Analysis

Defendant moves the Court to: (a) find that the four corners of the search warrant affidavit fail to satisfy the requirements of the Fourth Amendment; and (b) suppress any evidence seized as a result of the August 20, 2020, search warrant execution. Defendant also requests a *Franks* hearing because "the search warrant affidavit makes critical misstatements regarding [Defendant]'s business and finances with a reckless disregard for the truth." ECF No. 32, PageID.94-95.  The Government counters that the events in the days immediately before the search warrant was authorized establish probable cause for the search, with the other events providing background context.

The Fourth Amendment requires all warrants issued to be supported by probable cause. "To establish probable cause adequate to justify issuance of a search warrant, the governmental entity or agent seeking the warrant must submit to the

magistrate an affidavit that establishes 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (quoting *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009) (internal citation omitted)). Whether this fair probability is established depends on the totality of the circumstances. *Id*.   "The critical element in a reasonable search is not that the *owner* of property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." *Brooks*, 594 F.3d at 492-93 (emphasis added).

When reviewing an affidavit for sufficiency, "[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).   "Affidavits are not required to use magic words, nor does what is obvious in context need to be spelled out." *Id*. "Nor is an affidavit required to present proof that would without question withstand rigorous cross-examination." *Id*. Probable cause exists when there is enough "'reasonably trustworthy information' as 'to warrant a prudent man in believing that the [Defendant] committed or [is] committing an offense." *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The Supreme Court, "has long held that 'the term 'probable cause' . . . means less than evidence which would justify

condemnation' and that a finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial." *United States v. Ventresca*, 380 U.S. 102, 107 (1965) (citation omitted).

### A. Sufficient Nexus of Criminal Activity to Residence and/or Vehicle

Defendant first argues that the affidavit does not articulate a sufficient nexus between suspected criminal activity (or evidence to be seized) and Defendant's residence or vehicle. *Brooks*, 594 F.3d at 492-93. A sufficient nexus exists to search a home: (a) where there is evidence of drug trafficking in close proximity to the residence to be searched; and (b) where "some reliable evidence exists connecting the criminal activity with the residence." *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008).

Defendant states that the search warrant affidavit fails to establish any connection between criminal activity and Defendant's residence or vehicle, including failing to connect Ritter (or illegal conduct) to Defendant's residence or vehicle. Defendant contends that the affidavit focuses on the conduct of Ritter and others, rarely mentions Defendant by name, and the references to Defendant are generally vague, usually in the context of being Ritter's girlfriend. Relying on *United States v. Harvey*, 202 F.Supp.3d 771, 778 (E.D. Mich. Aug. 16, 2016), ("The only connection between the Kilbourne residence and Lamont Harvey is that he has been seen there and a car registered to him has been seen there.").

6

Defendant argues that the following "activity" is not sufficient to support the affiant's opinion that "Poole and Ritter are believed to be residing at the Subject Premises [Defendant's residence] and it is believed that inside the Subject Premises and the Target Vehicle [Defendant's vehicle] agents will find evidence of criminal activity related to conspiracy to traffic narcotics and the illegal possession of firearms:"

> 1. On October 15, 2019, Ms. Poole's car is parked in front of her home. A query of the vehicle shows that it is, in fact, registered to Ms. Poole. Exhibit A, ¶ 38.

> 2. On February 11, 2019, Ms. Poole's vehicle arrives at her home. Poole and Ritter exit the vehicle and walk to the home. Poole uses a key to open her own door. Poole and Ritter enter the home and close the door. Exhibit A, ¶ 39.

> 3. On August 18, 2020, Ms. Poole's car is parked in front of her home. Ritter is observed placing a box in the back of Ms. Poole's vehicle. Ritter walks to the driver's side of the vehicle and the vehicle departs. An hour or so later, Ritter walks towards the front door of Poole's house. Agents can't see if he uses keys to open the door. Exhibit A, ¶ 41.

> 4. Again on August 18, 2020, Ritter carries white plastic grocery bags to the door of Poole's house. He "appears" to use keys to open the door and enters. He looks around while doing so. Exhibit A, ¶ 42.

> 5. Also on August 18, 2020 Poole walks towards her own home carrying multiple bags. She appears to reach in a bag and opens her own front door. She enters her home. Exhibit A, ¶ 43.

ECF No. 32, PageID.113.

Defendant contends that there is nothing unusual about Ritter entering her home – or her doing so herself – in August 2020, 18 months after they were observed entering the residence together.  Defendant contends there is no information (utility bills, etc.) that: (a) links Ritter to her residence; (b) establishes that he had independent access to the residence or vehicle (such as his own key(s)); or (c) shows that he resided or consistently stayed at the residence.  Defendant states that the only illicit activity tying Ritter (or anyone) to her residence or the vehicle was Ritter's arrest driving her vehicle in 2019 and that activity did not involve narcotics or implicate her in any way.

The Government states that it is important to note that the subject of the search warrant is for a particular residence on Timberwood Court in Clinton Twp., MI and a Black Jeep Grand Cherokee with a particular Michigan license plate number. The search warrant is not for a particular person (such as Defendant) or the crimes she allegedly committed.  The Government maintains that the affidavit for search warrant includes numerous bases that demonstrate probable cause to believe that the residence and vehicle targeted might contain evidence of a crime.  Such bases include: (a) the history of a drug trafficking conspiracy involving Ritter and, at least according to CD-1, Defendant (by wiring money to pay for heroin and her vehicle being used by Ritter to receive a heroin delivery); (b) only a week prior to the search warrant application in this matter, Ritter and Defendant arriving at Defendant's

stepmother's house during the execution of a search warrant that yielded a large volume of fentanyl; (c) Defendant driving Ritter in the Target vehicle to her stepmother's; (d) Ritter admitting that he came to Defendant's stepmother's house to pick up a package of drugs (he claimed marijuana); and (e) Ritter stating that he was paying someone at Defendant's stepmother's house to receive the package of drugs.

In the 14-page history section, Ritter's connection to drugs is extensive and detailed by CW-1 and CD-1 and CD-2. There are some deficiencies in what they allegedly told the affiant (*e.g.*, CD-1 getting the color and model of the Jeep wrong, some of them not being able to identify Ritter or Defendant), and the activity they describe is dated (basically a year old). Ritter's acknowledgment of picking up a package of drugs on August 12, 2020 (one week before the search warrant application was made), however, adequately evidences his involvement in drug trafficking at the time the search warrant application was made. And, while the 2019 drug activity involving Ritter (and Defendant) described by CW-1, CD-1, and CD-2 does not provide a nexus for a search in August 2020, it does provide some context that the drug and firearm activity that transpired in August 2020 were not isolated and was probative of ongoing criminal activity by (at least) Ritter.

In the affidavit, Defendant is mentioned by name and as Ritter's girlfriend – and Defendant's stepmother confirmed on August 12, 2021 (a week prior to the

search warrant application) that Defendant was Ritter's girlfriend and that Ritter was "Marco." ECF No. 32, Ex. A at PageID.133-34.  CD-1 indicated that Ritter's girlfriend wired the money to pay for a heroin delivery received by Ritter and Ritter drove his girlfriend's vehicle. *Id.*  CD-2 stated that "Cole" (whom the affiant believed to be "Marco" a/k/a Ritter) resides in a condo style home near the intersection of 15 Mile Road and Utica (this is in the area in which Defendant's residence is located) and drove an all-black Jeep Cherokee (later identified as Defendant's vehicle).

The Court finds that there are numerous connections between Ritter and Defendant's residence and vehicle and that the Government has established a sufficient nexus between criminal activity and Defendant's residence and vehicle. As to the vehicle, Ritter was seen exiting it at Defendant's residence (as did Defendant) on February 11, 2019.  Ritter was arrested when driving Defendant's vehicle in September 2019, and CD-1 stated that Ritter drove a "blue Jeep Liberty" that his girlfriend drives.  CD-2 stated that Ritter had an all-black Jeep Cherokee. Ritter was with Defendant in her vehicle on August 12, 2020, when they arrived at Ms. Collins' home to pick up what Ritter admitted knowing was a package of drugs. Ritter, who was alone, was seen putting a medium size box in Defendant's vehicle (parked at Defendant's residence) on August 18, 2020, the day before the search warrant application was prepared and approved.  He then walked to the driver's side

of the vehicle and the vehicle departed the residence (although there is no express statement that he was driving).

As to Defendant's residence, Ritter claimed it as his address during a law enforcement encounter in 2019 and listed it as his address when filing his 2018 State of Michigan tax returns.  Ritter was seen entering the residence with Poole on February 11, 2019.  Ritter was seen entering and leaving that residence in 2019 and 2020, including the day before the search warrant application was made.  He "appeared to utilize keys to open the door" at approximately 9:00 p.m. on August 18, 2020, and was carrying white grocery bags at the time.  He also had entered and exited Defendant's residence alone at approximately 6:30 p.m. that day. CD-2 indicated that Ritter (Cole/Marco) lived in a condo style house in the area where Defendant's residence is located.

Defendant acknowledges that many statements (vague or otherwise) regarding Ritter are included in the affidavit, but she asserts that the statements in the affidavit do not tie Ritter to Defendant's residence and vehicle.  She notes that there are four interviews from a cooperating witness (CW-1) and two cooperating defendants (CD-1, CD-2), but those interviews took place between July 17, 2019 and October 29, 2019 – one year prior to the search warrant application.  She argues that such statements are vague, lack a timeframe, and are stale because the alleged drug and related firearms activity occurred approximately a year before the search

warrant application was made.  Defendant states that CW-1 has not identified Ritter in any manner and claims that there is no indication for why the affiant believed "Marco" or "Koe" (or "Cole") to be Ritter or that Defendant was the girlfriend of Ritter. Defendant also asserts that CD-1 claimed that Ritter utilized a "blue Jeep Liberty that his girlfriend drives" but Defendant's vehicle is a black Jeep Grand Cherokee.  Defendant believes the inconsistency in color and model of the vehicle is significant.  Defendant also directs the Court to the fact that CD-2 did not give a timeframe for when Ritter was residing at a condo, could not identify the condo from a photograph, or otherwise connect Defendant's home with illicit activity.

Defendant does not challenge that Ritter once provided law enforcement officers with the address of Defendant's Timberwood Court residence as his address. She argues, however, that he may have had multiple addresses since then.  Defendant also states that the Government is not revealing the current address on Ritter's driver's license, which suggests that it is a different address.  Defendant believes that Ritter's arrest in Warren, Michigan in September 2019, while driving Defendant's vehicle at excessive speeds (approximately 100 m.p.h.) is not probative for purposes of establishing a nexus between criminal activity and Defendant's home and vehicle. Defendant argues that she was not in the vehicle, and the two firearms found in the vehicle were not hers.

The Court notes that it was during that September 2019 law enforcement encounter that Ritter provided the address of Defendant's residence as his address. It also established that Defendant had possessed firearms, including one that matched the description of the firearm CD-1 indicated Ritter typically armed himself. The Court might also note that Ritter had listed the address of Defendant's residence on his State of Michigan tax return for 2018 (Ritter had no reported income in Michigan 2019).

The search warrant application includes detail regarding a series of calls made by Ritter during the month of October 2019, when he was in jail. ECF No. 32, Ex. A 14-15. Defendant maintains that these calls have nothing to do with her residence or her vehicle and that there isn't even any indication she spoke with Ritter. The person speaking to Ritter referred to "the stuff" and "your two weapons," and Defendant insists that these calls do not establish that the "individual on the line" knew before Ritter's arrest that he was traveling with firearms or that the affiant took any steps to link Defendant with the phone number called by Ritter (as there is no indication that Defendant or Ritter identified the call recipient as Armani Poole or otherwise uttered personal information that would tie the call to Defendant). Defendant does not, however, state that she was not the person that had conversations with Ritter while he as in jail on the number associated with her. The Court finds that those conversations reflect that Defendant knew that Ritter

13

possessed two firearms at the time of his arrest in 2019 and that he was on probation at that time (even if she did not know prior to that conversation that he possessed firearms).

Defendant next challenges the alleged nexus between any "financial analysis" and her residence and vehicle. She acknowledges that the affidavit describes various bank accounts of, and transfer of funds between, Ritter and Defendant, but states there is no detail for the accounts, including addresses, or specific time frames for the alleged transfers. Defendant contends that the affiant was misleading and suggested that she maintained an illegal business because he stated that the "Michigan Department of Treasury has no applications to register the business and no records of taxes being filed" with respect to Defendant's business, AP & Co, LLC.

Defendant notes that AP & Co, LLC is a business registered with the Michigan Department of Licensing and Regulatory Affairs (LARA), as of April 5, 2019, with her residence as the agent address, and that a website for the business was established in 2019. She also notes that the absence of a tax return is not significant because the company was formed in 2019 and an extension of her 2019 tax return would mean taxes would not have been due until mid-October 2020. Defendant states that she filed her 2019 taxes in April 2020, including her income and business expenses related to AP & Co, LLC.

14

The Court agrees that the financial information regarding Defendant's business does not establish any connection to illicit activity and may be troubled by the affiant's reliance on the Michigan Department of Treasury as a source of whether a business entity exists in Michigan.  The Court also finds it irrelevant that a tax return allegedly was not filed for 2019 when: (1) extensions are often sought; (2) the return would have been due in the midst of the Covid-19 pandemic and delays may reasonably have been attributable to Defendant or the Michigan Department of Treasury; and (3) Defendant actually timely filed her return.  The information regarding Defendant's business, however, is not necessary to find that the search warrant application "establishes 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Brooks*, 594 F.3d at 492 (citation omitted).

Defendant asserts that her lawful possession of two firearms on August 12, 2021 – one in her purse and one in the center console – also does not establish the requisite nexus between criminal activity and her residence or vehicle.  Defendant believes that the affiant had no basis for making the assumption that "it is uncommon for individuals with a license to carry a concealed weapon to carry multiple firearms in their vehicle at the same time," and concluding that the gun in the console "was being utilized by RITTER."  She states that there is no indication that Ritter knew of the firearm in the center console, and neither she nor Ritter made any statements

suggesting that either gun was used by Ritter (or that he even knew about it).  She further states that when Ritter was arrested in September 2019, he had his own firearms (or at least firearms not belonging to her).

The Court finds that the facts that Ritter possessed firearms in the vehicle in September 2019 and that there were two firearms in the vehicle on August 12, 2020 when Ritter and Defendant drove to pick up illegal drugs are probative of whether firearms were in the possession of Ritter.  The affiant states that, based on his training and experience, it is uncommon for someone with a CPL to carry multiple firearms in her vehicle.  The affiant likewise avers that it is common for persons to have firearms with them when they are engaged in drug trafficking, as Ritter was on August 12, 2020, only a week before the search was conducted.

For the reasons stated above, the Court finds that, based on a totality of the circumstances, the affidavit in support of the application for search warrant in this case "establishe[d] 'a fair probability that contraband or evidence of a crime w[ould] be found in" Defendant's residence and/or vehicle. *Brooks*, 594 F.3d at 492 (citation omitted)).  The Court also concludes that, although some of the information in the affidavit was dated, that information was not necessary to establish a sufficient nexus between other, contemporaneous criminal activity set forth in the affidavit and Defendant's residence and vehicle.

Defendant also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  To prove a *Franks* violation, a defendant has the burden to make a preliminary substantial showing that: (1) a sworn affidavit to a search warrant includes a statement either knowingly or intentionally made or made with reckless disregard for the truth; and (2) the allegedly false statement is necessary for a finding of probable cause. *Id*. at 155-56.

Defendant claims that the affiant knowingly, intentionally, or with reckless disregard for the truth represented that "[Defendant] has a bank account associated with AP&CO LLC as a business owner. Michigan Department of Treasury has no applications to register the business and no records of taxes being filed." ECF No. 32, Ex. A at 17-18.  Defendant argues that, in addition to this being an implication that her business is illegitimate, agents made no attempt to confirm registration with LARA or obtain an identification number from the IRS.  She states that she registered her business with LARA in 2019 and filed an annual statement in May 2020.  She notes the affidavit also failed to specify which year(s) Defendant allegedly failed to pay taxes for, as she filed her 2019 tax return (the only relevant year) in early 2020, well in advance of the submission of the application for search warrant to the magistrate judge.  On this basis, Defendant contends that she has made the preliminary showing necessary to have a *Franks* hearing.

17

The Government argues that no *Franks* hearing is necessary because: (a) Defendant does not make the minimum showing required; (b) the information was not false; and (c) Defendant cannot show that the allegedly wrongful information has any bearing on the validity of the search warrant.  The Court agrees.

As discussed above, even if the Court were to consider the affiant's statement pertaining to the absence of a registered business with the Michigan Department of Treasury (or the filing of a tax return) to be knowingly or intentionally made or made with reckless disregard for the truth, that allegedly false statement is not necessary for a finding of probable case.  Technically, the statement regarding the absence of a registered business with the Michigan Department of Treasury is not false, though it certainly is misleading because Defendant's business was registered with LARA. Accordingly, the Court declines to hold a *Franks* hearing in this matter.

## IV.   Conclusion

For the reasons stated above,

IT IS ORDERED that Defendant's Motion to Suppress [ECF No. 32] is DENIED.


Date: May 4, 2022                    s/Denise Page Hood
                                     Denise Page Hood
                                     United States District Judge